**DOLLCRAFT INDUSTRIES, LTD., Plaintiff,**

v.

**WELL-MADE TOY MANUFACTURING COMPANY, and Frederick Catapano, Defendants.**

No. 78–C–1434.

United States District Court, E. D. New York.

Aug. 3, 1978.

Thomas M. Gibson, John L. Welch, Bartholomew Verdirame and Morgan, Finnegan, Pine, Foley & Lee, New York City, for plaintiff.

Louis Strassberg and Strassberg & Strassberg, New York City, for defendants.

BRAMWELL, District Judge.

[ORAL OPINION OF THE COURT]

THE COURT: The instant matter concerns Dollcraft Industries' motion for an order preliminarily enjoining Well-Made Toy Manufacturing Company from making, distributing, selling or otherwise using any copies of the accused toys at issue herein on the ground that such use constitutes statutory copyright infringement and unfair competition and violates section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Three small stuffed toy lambs, one medium stuffed toy bunny and one rather large stuffed toy bunny form the foundation upon which this suit is built.

In light of the fact that time is a factor in disposing of this matter, I have decided to proceed by way of a bench opinion. Thus, the opinion to follow constitutes my findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Turning first to my findings of fact, they are as follows:

(1) Dollcraft Industries, the plaintiff in this action, is a New York Corporation having its principal place of business on Lafayette Street in New York City. Its business is that of manufacturing and selling stuffed toys and bean bags. Although it manufactures most of its toys at its Lafayette Street headquarters, some of its products are contracted out for assembly to other manufacturers.

(2) Plaintiff employs approximately 70 to 100 workers, said work force fluctuating in size according to the demands of the market. Among its employees are Ms. Aubrey Greene and Wenceslar Martinez, Ms. Greene being the daughter of Joseph Weiss, the president of plaintiff corporation.

(3) Since at least 1970, Ms. Greene and Mr. Martinez have united in a team effort in the creating of new toy designs for the plaintiff. Although they work together, their respective roles are somewhat distinct. The testimony shows that Ms. Greene sports the conceptual role, while Mr. Martinez interprets her ideas and attempts to transpose them into reality. Although not graphically gifted, Ms. Greene will verbally describe her ideational designs to Mr. Martinez at which point Mr. Martinez will interpret her concept, make a pattern, assemble it, and then present the completed work to Ms. Greene for approval. According to Mr. Martinez, at times, the successful implementation of this process does not come as simply or smoothly as do the words to describe it. Sometimes his interpretation will be rejected by Ms. Greene until the completed product apparently embodies her mental impression. Besides having this inspirational role, Ms. Greene is responsible for the work involved in securing copyrights on original toy designs for Dollcraft.

(4) When attempting to come forward with an original design, it appears that neither Mr. Martinez nor Ms. Greene will have photographs or models of toys before them. In fact, Mr. Martinez testified that he does not look at catalogs. While Ms. Greene testified that she occasionally looks at European toy catalogs, she also testified that prior to creating the toys at issue, she did not do so. She further testified that she never saw the plaintiff's three toy lambs or rabbits in any toy catalogs prior to their creation.

(5) The defendant Well-Made Toy Manufacturing Company is a New York Corporation which has its principal place of business in Brooklyn, New York. Like the plaintiff, Well-Made's business is that of manufacturing and selling toys. It makes a variety of at least 100 toys. The defendant Fred Catapano is the president of Well-Made. Ms. Josephine Lazzarini-Battiala is a toy designer for Well-Made Toys and has been with the defendant in that capacity since September of 1977. Although Ms. Lazzarini-Battiala described her own creative procedure, she did not testify that she was the

creator-designer of any of the defendant's toys at issue herein.

(6) Among the plaintiff's toys at issue herein are three baby toy lambs, each of which the plaintiff has named Lamie Pie. The evidence shows that these lambs are normally sold as a three piece assortment. Lamie Pie 903 is a standing lamb which was marked as plaintiff's Exhibit 4. Lamie Pie 803 is a sitting, cuddle lamb which was marked as plaintiff's Exhibit 2. Lamie Pie 334 is a slumbering lamb which was marked as plaintiff's Exhibit 3.

(7) The first of the three lambs to be created and manufactured was the slumbering lamb. Prior to its publication, this lamb was shown to a buyer from W. T. Grant who suggested to Ms. Greene that a group assortment of three lambs would be a better idea. Other than this voluntary suggestion, the buyer had no input into the creative process. Ms. Greene took heed of her advice, and Ms. Greene created and Mr. Martinez designed companions for the slumbering lamb, one sitting and one standing.

(8) The lamb assortment was not and, to date, is not manufactured by Dollcraft. Instead, this job was contracted out to Terry Industries. The manufacturing of the slumber lamb commenced several months before its sitting and standing comrades were manufactured. Mr. Leo Marchisello of Terry Industries was uncertain whether he began manufacturing the lambs in 1973 or 1974. However, according to Dollcraft's records as testified to by Ms. Greene, the three lambs were published as an assortment and first sold in November of 1974.

(9) Each lamb of this assortment has been admitted into evidence, and an examination of each one reveals that a copyright notice label has been sewn to each body.

(10) In March of 1978, a copyright registration for each lamb in this assortment was issued. Each certificate sets forth November 12, 1974 as the first publication date for each lamb. Said publication date was founded upon Dollcraft's records. Ms. Greene prepared and signed each registration.

(11) The concept embodied within the confines of plaintiff's large crouching rabbit which is Exhibit 6, was born from Ms. Greene's personal response to a certain jaunt to the Central Park Zoo. Upon seeing a rabbit with a black eye patch in a crouching position, Ms. Greene requested her colleague, Jane, to sketch the rabbit. Thereafter, said sketch was adapted and transposed into a toy form bearing the name Honey Bunny. Originally it was made in black and white. Later, the colors were changed. According to Dollcraft's records as testified to by Ms. Greene, this Honey Bunny croucher was first sold in January of 1973. Sewn on to the plaintiff's Exhibit 6 is a copyright notice label.

(12) A certificate of copyright registration on this large crouching Honey Bunny was sought by and subsequently issued to Dollcraft on March 13, 1978. Ms. Greene prepared and signed the registration form for said toy.

(13) The last of plaintiff's toys that the defendant has allegedly copied is Exhibit 5, a sitting cuddle bunny with stuffed ears. This toy evolved from a change in Federal regulations which prohibited the further use of wire in the ear of a toy. As a consequence of this directive, Ms. Greene and Mr. Martinez combined their energies to develop a rabbit with stuffed ears. Initially, they placed stuffed ears on their previous wire-eared bunny. Their previous wire-eared bunny's photograph is Exhibit 11. Unhappy with the result, they proceeded to work on this project for several months. Finally, they designed and developed a toy rabbit similar to yet distinct from the previous wire-eared bunny. Specifically, the entire head structure was changed to naturally and aesthetically accommodate unsupported, separated stuffed ears. This sitting bunny was also entitled Honey Bunny.

(14) A certificate of registration was issued to plaintiff on this bunny on March 13, 1978. According to said certificate, this sitting Honey Bunny was first published on December 5, 1973.

(15) Each copyright registration issued on plaintiff's toys designates the author of each respective work as Dollcraft. Said statement is substantiated by the testimony of Ms. Greene and Mr. Martinez as well as the facts surrounding the origin of each toy.

(16) Dollcraft makes a substantial effort to insure that each of the plaintiff's toys at issue are manufactured and subsequently distributed with the proper copyright notice attached to each toy.

(17) As to those toys that are subcontracted out for manufacture, Dollcraft supplies its contractors with the proper copyright notice labels and directs them to attach said labels to the toy reproductions. One of the plaintiff's contractors, Leo Marchisello of Terry Industries, testified that he always received an adequate supply of copyright notice labels from Dollcraft for every toy he manufactured for them and that he used his best efforts to be sure said labels were affixed to each toy. A contractor's finished products are sent to Dollcraft, not Dollcraft's customers. Dollcraft conducts spot checks of the toys contracted out by requesting random samples of the same. In the course of this spot check, the toys are examined to be certain that the copyright notice labels have been properly affixed to the toys. Of the five toys at issue herein, plaintiff wholly contracts out the manufacture of the lamb assortment and partially contracts out the manufacture of the medium size sitting Honey Bunny, Exhibit 5.

(18) When the toys are manufactured by Dollcraft itself, as is the case of the large crouching Honey Bunny and which is partially the case of the medium sitting Honey Bunny, it is the responsibility of the foreman of Dollcraft's sewing department to see that every toy has the copyright notice label affixed to it. Ms. Greene also makes checks by occasionally visiting department stores and examining Dollcraft's products on display therein. Ms. Greene testified that she never examined any toy which did not have the proper copyright notice label affixed to it.

(19) As has been noted, each of the plaintiff's toys that have been introduced into evidence has the proper copyright notice label securely fastened to it. Although Mr. Catapano stated in his affidavit that he had purchased plaintiff's toys without such labels affixed thereto, he did not produce any of these toys or the pieces thereof in support of his statement, nor were any witnesses presented to substantiate this claim. Furthermore, he did not specify either the time or place where he claims to have purchased the unlabeled toys. In fact, he did not specify which toy or toys he purchased without the proper label. In determining the weight to be given the statement in his affidavit, Mr. Catapano's testimony is of significance. During the hearing, Mr. Catapano commented on his beginnings in the toy industry and his association with a Mr. Eidelberg, a person who is now allegedly associated with the plaintiff in an unknown status. Specifically, as evidenced on page 218 of the transcript, Mr. Catapano stated, "When he [meaning Mr. Eidelberg] came into business with me, I knew nothing. I was only a contractor and an honest person. Until he had problems and he left. But there was certain patterns missing which I did see in the Dollcraft line later on. And I decided I better start to understand what they're doing since they know my business." Such a statement possibly evidences a hardened, unscrupulous business attitude and, when considered with the complete lack of evidence on the label issue, casts a significant shadow on the credibility of the affidavit statement which was made by a clearly interested witness. Consequently, I find that Mr. Catapano's affidavit statement is worthy of little or no weight on this issue.

(20) Dollcraft sells its products in interstate commerce to various retailers, including department stores. In the past ten years, it has not issued a catalog but sells its designs by way of exhibiting its toys to potential buyers.

(21) The defendant Well-Made also sells its products to retailers and apparently does so through the use of catalogs.

(22) As a routine part of operating Well-Made, Mr. Catapano shops for toys manufactured by his competitors, especially Doll-

craft. He also purchases these items and proceeds to dissect them. Although Mr. Catapano testified that his particular interest in Dollcraft stems from his former association with Mr. Eidelberg, there is not even the slightest scintilla of evidence that Mr. Eidelberg was involved in any way with the underlying concept, creation and design of plaintiff's five toys at issue herein.

(23) Mr. Catapano admitted that he saw Exhibits 2, 3, 4, 5 and 6 and that he bought and inspected said toys prior to Well-Made's manufacturing of Exhibits 16, 15, 17, 14 and 13 respectively. He further admitted that he "knocked off" the plaintiff's toys. As reflected on page 217 of the transcript, he stated that "This is one of hundreds of toys that I've taken from other competitors and either knocked off or tried to understand how they based their cost and overhead factors. We all do this in a trade. We all do that, even Toycraft [which probably should read Dollcraft] does it, even if they deny it."

(24) Dollcraft first became aware of the existence of the accused toys on the market just before Easter of 1978 when Ms. Greene observed two of the accused toy rabbits, Exhibits 13 and 14, on display in Alexander's Department Store in White Plains. Subsequently, Ms. Greene discovered that the defendant Well-Made's toy catalog contained the accused lamb assortment. Thereafter, a cease and desist letter was sent by Dollcraft to the defendants on March 14th and 17th, 1978. Said letters and the defendants' response thereto are attached as Exhibits A, B and C, respectively, to the affidavit of Joseph Weiss. To date, the defendants continue to manufacture, sell and distribute the accused toys.

(25) Upon visual inspection and comparison of plaintiff's three lambs, Exhibits 2, 3 and 4, to the defendant's three lambs, Exhibits 16, 15 and 17 respectively, the overall appearances are substantially similar. There is a subtle likeness between the whole respective articles. Not only is there a community of expression, the basic color, the same fabric, face, posture, mouth, nose and shape of ears duplicate those of the plaintiff's lambs. Given the fact that Mr. Catapano admitted to knocking off the plaintiff's toys, such a conclusion is most logical. Furthermore, such a conclusion of substantial similarity is further buttressed by the record at page 110 where the defendants' attorney stood corrected by the Court when he mistakenly picked up the defendants' lambs intending to show the witness the plaintiff's lambs. Such confusion is manifested by his response to the Court's correction that, and I quote, "I don't want to get the wrong lambs."

(26) Upon a visual, inexpert comparative examination of plaintiff's bunny, Exhibit 6, and defendants' bunny, Exhibit 14, both of which are large crouching bunnies, I find as a matter of fact that they both embody the same artistic conception of a rabbit. Although the plaintiff has employed a cream colored body with a darker cream underbelly and has accented its toy by a pink tail and pink contouring around its eyes and ears and has used a tear drop shaped eye patch, and although the defendants have varied their toy by employing a pink body with a darker pink underbelly and have accented their toy in the same exact manner as plaintiff but by using a white tail and white contouring around the eye and have used a round plastic eye, these differences are minimal and have little or no effect on the untrained eye's impression that both have captured the same visual character and non-verbal expression of an idea.

(27) As to the sitting bunnies vying for a spot in the market place, a comparison of the overall appearance of defendants' bunny, Exhibit 13, and plaintiff's bunny, Exhibit 5, readily shows that the defendants' bunny mirrors the plaintiff's expression and personality interjected into its toy. Although the defendants' cocoa colored rabbit appears to have less stuffing and, consequently, results in a slightly thinner, less plush appearance than plaintiff's pleasantly plump biscuit colored rabbit, again, these are minor differences which do not play upon the senses a different impression. The toys are in the same proportion and are

not only created with the exact same eyes, ears, nose, mouth, head shape and body shape, said components parts have been arranged in such a manner as to mimic plaintiff's creative expression.

(28) While it is true that the rudiments of the body forms of all of the toys at issue, that is, a body depicting sitting, standing and lying positions, have been employed by the stuffed animal industry to the joy of innumerable children for many years, there is no evidence that the plaintiff copied their toys from any pre-existing toys. Similarly, while it is true that some of the eyes, noses and mouths can be readily purchased from certain supply houses, there is absolutely no evidence that the plaintiff copied from other toys the manner of compiling them together and the imaginative expression of the idea which emerges upon the plaintiff's use of such objects.

(29) None of the catalogs or toy exhibits submitted to the Court show that plaintiff's expression of an idea is unoriginal or was copied from prior toys. All of said exhibits possess visibly distinct overall expressions than those attributable to the plaintiff.

(30) With respect to catalog Exhibit F, the defendants directed the Court's attention to Childhood Classic's 1952 version of a toy lamb. Said catalog contains photographs of two lambs, both of which are characterized by forms of expressions dissimilar to that of plaintiff's lambs. One such lamb resembles an adult rather than a baby lamb. The other lamb resembling a baby lamb has a different body, ears, head and nose, and, unlike the plaintiff's lambs, it possesses a somewhat dazed, rigid expression.

(31) Exhibit H, a 1967 Knickerbocker Toy catalog, was offered by the defendants on the issue of the originality of plaintiff's sitting Honey Bunny, Exhibit 5. However, the bodies of the animals depicted and circled by the defendants therein differ from the body created by the plaintiff. Although an examination must be made of the whole rather than an examination of dissected parts, this particular part of plaintiff's toy, when viewed with the entire object possesses an individual expression. Although both bodies are in a sitting position, this is the extent of the resemblance. The arms of plaintiff's Exhibit 5 are extended slightly upward in such a gesture as to suggest that the toy is desirous of being picked up and caressed. The arms of the circled Knickerbocker toys, however, clearly extend outward and do not hint of any particular expression. The body appears lifeless, mechanical and vacant.

(32) Defendants' Exhibit J was also submitted for consideration on the question of the originality of plaintiff's Exhibit 5. This 1966 rendition of My-Toy's expression of a rabbit is incomparable with the plaintiff's rabbit but for the one identifying feature that they are both identifiable as rabbits. However, each toy's expression of this concept is very different indeed. Although the photograph in Exhibit J may depict a rabbit with stuffed ears, the ears are a flattened expression of ears. As such, they are in harmony with the flattened somewhat amazed look of the whole toy. Furthermore, the ears of the rabbit depicted in Exhibit J appear to be a mere continuation of the head with no indentation or molding of the ear occurring at the base of the ear, which is the case of plaintiff's rabbit's ears. The noteworthiness of the fact that these ears are stuffed is further diminished by Ms. Lazzarini-Battiala's testimony that the ears of toys are usually pinned for catalog photographs in such a way as to more favorably portray their features.

(33) As Exhibit L, the defendants introduced a 1954 Gund catalog which contained two photographs of toy lambs: one on page 6 and the other on page 4. Again, the totality of the lambs' features set forth a creative expression dissimilar from plaintiff's. The lamb on page 6 is napping, and it only appears to have one pair of legs. The lamb on page 4 has a square-shaped crown and an almost frightened expression.

(34) Exhibit M is Gund's 1955 black and white catalog in which a lamb toy is depicted hanging from an elastic strap. Unlike plaintiff's lamb, this lamb has sleepy-type eyes, an embroidered nose and mouth, a

different composition of body and head, and it captures an entirely different expression of feeling and idea than the plaintiff's lambs.

(35) Exhibit N is a 1970 Gamble Aldens Christmas catalog which on page 31 depicts a full color photograph of a musical lamb. Although the head is shaped somewhat similarly to the plaintiff's, as a whole, the lamb emotes a different expression. Unlike the plaintiff's lambs, this lamb's facial expression is somewhat perplexed. The total contour of the animal is dissimilar from plaintiff's. Furthermore, there is absolutely no evidence that Ms. Greene or Mr. Martinez saw and employed the expression of this idea as embraced by this lamb. Indeed, the evidence shows that Ms. Greene and Mr. Martinez did not look at catalogs before creating the subject lambs.

(36) Exhibit O is a full color 1972–1973 catalog of Commonwealth Toy and Novelty Company. Page 8 sets forth a photograph of a small lamb. Again, its body, head and expression vary from those of plaintiff's lambs. Although both toys encompass the generic idea of a baby lamb, each toy gives forth a particularly distinct impression. An analogy to the graphic world may clarify my finding. Although the history of art is replete with still life paintings which have been put on canvas by use of similar brush strokes and are highlighted in similar colors, a lay observer's comparison of, for example, Picasso's expression of a bowl of fruit and Chagall's expression of a bowl of fruit would result in a finding of dissimilarity. Although the underlying idea may be the same, each artist's personality reaches out and his individual interpretation of the subject is clearly reflected in his work. Turning back to the picture in Exhibit O and the plaintiff's lamb, both personify different interpretations of the idea of a lamb. The plaintiff's lamb touches upon the concept of a plump and perhaps lost, very young lamb. Commonwealth's lamb, however, gives the sensation of a more ungainly, rigid baby lamb. While the plaintiff's lamb possesses definite eye contact with the observer, Commonwealth's lamb's eyes are cast downward. Exhibit O's legs form an inverted "V" and its head comes to a softened point, both of which find no place in the composition and expression of plaintiff's lambs.

(37) Turning next to the actual toy exhibits introduced by the defendant on the issue of originality, I find as a matter of fact that these, too, do not show that plaintiff's lambs are unoriginal. Exhibit G, a small, disproportioned white lamb, and Exhibit K, a small cocoa colored rabbit are so patently dissimilar from the expression personified in the plaintiff's lambs and rabbits that a detailed analysis is not only unwarranted but would be an idle ceremony indeed.

(38) Exhibit I is a bright pink toy rabbit with jovial bright blue eyes, a pom-pom nose, a pom-pom muzzle and a smiling mouth. From the verbal description alone, diversity of expression is apparent. Not only is the facial expression and its component parts different, it is a flat rather than rounded toy rabbit. Its ears may be stuffed, but they are more accurately described as one large ear stitched down the middle to give the appearance of two ears. Plaintiff's rabbits' ears, however, stand separately and unsupported by stitching.

(39) Ms. Lazzarini-Battiala's testimony as to her opinion that some of the above exhibits are the same as the plaintiff's toys is undercut by two significant factors. First, her testimony concerned the similarity of patterns, not the modifications thereof or the effect on the expression of the idea by such modifications coupled with the particular manner in which the features are assembled on the plaintiff's completed toys. Secondly, Ms. Lazzarini-Battiala's definition of originality is such that virtually no toy but for the very first toy of that kind is an original toy. For example, Ms. Lazzarini-Battiala's testimony clearly indicates that either the Paddington or Winnie the Pooh stuffed toy bear would not be an original in her opinion as only the very first Steiff bear introduced in the early 1900's is worthy of such a distinction. Ms. Lazzarini-Battiala's definition of originality is more

congruent with the legal definition of "novelty", an attribute which is not a necessary concomitant feature of an item sought to be copyrighted. In light of her interpretation of "originalty", Ms. Lazzarini-Battiala's testimony that plaintiff's toys are unoriginal in terms of their copyrightability is without significant weight.

(40) Defendants' accused toys Exhibits 13 and 14 have tags attached to their respective ribbons which state that each toy is an "Original design by Well-Made Toy." Nowhere did the defendants claim that either they or Ms. Lazzarini-Battiala originated these designs. Rather, to the direct contrary, Mr. Catapano admitted that these designs were copied from the plaintiff's Exhibits 5 and 6, respectively. When questioned why he so labeled the toys, one of his responses was that the use of such tags was a common industry practice.

(41) The logical conclusion to be drawn from the foregoing facts is that the plaintiff did not copy its design from any pre-existing toy but, instead, was the originator of the designs in dispute. It is further found that plaintiff's toys at issue herein were intentionally copied by the defendants. Since the defendants have apparently continued the manufacture and distribution of the accused toys after the plaintiff's request to cease performing said acts, it is found, as a matter of fact, that the defendants have intentionally continued to make use of the accused toys for their benefit with knowledge of the plaintiff's claim.

Turning next to my conclusions of law, this Court has jurisdiction over this action for injunctive relief pursuant to 17 U.S.C. § 101 and 28 U.S.C. § 1338(a) and (b) (1976).

Venue is proper in this judicial district under the directives of 28 U.S.C. §§ 1391(b) and 1400(a) (1976) because the defendants may be found in this district.

■ In order to grant the requested preliminary injunction, under the often cited Second Circuit test of *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973), a plaintiff must show "either (1) probable success on the merits *and* possible irreparable injury *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 250 (emphasis in original). However, as noted by the Second Circuit in *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978), "[i]n copyright cases, . . . if probable success—a prima facie case of copyright infringement—can be shown, the allegations of irreparable injury need not be very detailed, because such injury can normally be presumed when a copyright is infringed." *Id.* at 94. Indeed, under the Second Circuit's holding in *Rushton v. Vitale*, 218 F.2d 434 (2d Cir. 1955), "[w]hen a prima facie case for copyright infringement has been made, plaintiffs are entitled to a preliminary injunction . . . ." *Id.* at 436.

Turning now to the question of the plaintiff's probable success on the merits, the substantive principles of copyright law must be examined. Of initial note is that under the holdings of cases such as *Blazon, Inc. v. DeLuxe Game Corp.*, 268 F.Supp. 416 (S.D.N.Y.1965), *R. Dakin & Co. v. Charles Offset Co.*, 441 F.Supp. 434 (S.D.N.Y.1977), and the *Rushton* case, *supra*, toy animals are entitled to copyright protection.

■ As was stated by the Second Circuit in *Uneeda Doll Co. v. P & M Doll Co.*, 353 F.2d 788 (2d Cir. 1965); "[i]t is well settled that there can be no copyright on an 'idea' itself but only on the tangible 'expression' of the idea." *Id.* at 789. Thus, copyright law protects an individual's concrete expression of his own idea.

■ According to the Second Circuit in cases such as *Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976), and *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090 (2d Cir. 1977), in order for a copyright infringement to be found to exist, the plaintiff must prove ownership of a valid copyright and then a copying by the defendant.

Under the instant facts, there is no question that the plaintiff is the rightful owner of the copyrights at issue, and, indeed, the defendants have not come forward with any proof or arguments to the contrary. Although the designs of the plaintiff's toys at issue were created by Ms. Greene and Mr. Martinez, and some of these toys were manufactured by contractors, it is well settled that when works are done for hire, the copyright belongs to the employer. Moreover, none of these parties claim title to the copyrights but, instead, apparently agree that Dollcraft is the owner thereof.

█ As to the validity of the copyrights at issue, one of the prerequisites to such a holding is that the copyrighted articles are found to be original. However, by reason of 17 U.S.C. § 410(c), there will be a presumption of originality and validity of the subject copyrights in certain instances. 17 U.S.C. § 410(c) provides "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." Thus, since the registrations for plaintiff's lambs and the sitting Honey Bunny were made within five years of the first publications of said toys, their certificates constitute prima facie evidence of the facts contained therein, including the originality of the articles and the ownership of said copyrights.

█ According to Professor Nimmer, at this point it is the defendant's burden to overcome this presumption. 1 Nimmer on Copyright, § 139.2 at 603 (1976). As to plaintiff's large crouching bunny, which falls without this statutory presumption, plaintiff carries the burden of proving originality. Under the facts of this case, the defendants have not met their burden while the plaintiff has met its burden.

According to the Second Circuit, in order for a copyright to be valid, the copyrighted work must contain some substantial, not merely trivial originality. *Alfred Bell & Co. v. Cotalda Fine Arts, Inc.,* 191 F.2d 99, 103 (2d Cir. 1951). The Second Circuit has recently defined originality upon a re-hearing *en banc* in *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486 (2d Cir.), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976), in which it stated:

> Originality is, however, distinguished from novelty; there must be independent creation, but it need not be invention in the sense of striking uniqueness, ingeniousness, or novelty . . . . Originality means that the work owes its creation to the author and this in turn means that the work must not consist of actual copying. . . .
>
> The test of originality is concededly one with a low threshold in that "[a]ll that is needed . . . is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.' "

*Id.* at 490. Thus, the author does not have to make something from scratch.

As was the case in *R. Dakin & Co. v. A & L Novelty Co.,* 444 F.Supp. 1080 (E.D.N.Y. 1978), and *Fisher-Price Toys v. My-Toy Co.,* 385 F.Supp. 218 (S.D.N.Y.1974), the defendant herein painstakingly attempted to show that many of the features incorporated into the plaintiff's toys, such as their bodies, arms, legs, eyes, noses, mouths and ears, have been present in the stuffed animal market and employed by its purveyors for many years. He thus argued that the plaintiff's toys are not sufficiently original to warrant copyright protection. However, this Court agrees with Judge MacMahon's response to this argument in the *Fisher-Price* case, wherein he stated that the fact that plaintiff's toys

> contained features separately found on other dolls does not render their copyrights invalid. Rather, the original combination of these features into new dolls makes the dolls copyrightable.

*Id.* at 220. Indeed, as was aptly noted by Justice Story:

> In truth, in literature, in science and in art, there are, and can be, few, if any, things, which, in an abstract sense, are strictly new and original throughout. Every book in literature, science and art,

borrows, and must necessarily borrow, and use much which was well known and used before. . . . If no book could be the subject of copy-right which was not new and original in the elements of which it is composed, there could be no ground for any copyright in modern times, and we would be obliged to ascend very high, even in antiquity, to find a work entitled to such eminence. Virgil borrowed much from Homer; Bacon drew from earlier as well as contemporary minds; Coke exhausted all the known learning of his profession; and even Shakespeare and Milton . . . would be found to have gathered much from the abundant stores of current knowledge and classical studies in their days. . . .

In truth every author of a book has a copy-right in the plan, arrangement and combination of his materials, and in his mode of illustrating his subject, if it be new and original in its substance.

*Emerson v. Davies,* 8 F.Cas. 615, 619 (C.C.D. Mass.1845) (No. 4,436). Such an observation is equally applicable to toy designs. To hold to the contrary would constitute the adoption of a novelty rather than an originality standard for copyrights, which, needless to say, would be inapposite to our current law.

■ Of further note in respect to the defendants' defense is the Second Circuit's statement in *Novelty Textile Mills, Inc. v. Joan Fabrics, Corp., supra* at 1093 n.3:

The existence of a prior work (whether in the public domain or not) is significant only if (1) the plaintiff copied from that work; or (2) the defendant copied from that work.

The Court went on to note that,

[a] work is original and may command copyright protection even if it is completely identical with a prior work provided it was not copied from such prior work but is rather a product of the independent efforts of its author.

*Id.* (quoting 1 *Nimmer on Copyright,* § 10.1, at 34 (1976)). Moreover, as was stated by the Second Circuit in *Gerlach-Barklow Co. v. Morris & Bendien, Inc.,* 23 F.2d 159 (2d Cir. 1927),

[w]hile a copy of something in the public domain will not, if it be merely a copy, support a copyright, a distinguishable variation will . . . . .

*Id.* at 161.

Here, I have found that none of the exhibits in evidence nor the testimony attendant thereto have demonstrated that the plaintiff's animals were copied from any others. Further, none of the exhibits support the inference that the defendant copied from the exhibits rather than the plaintiff's toys. Accordingly, applying the originality standard, it is found that the plaintiff has adequately proved, whether by invocation of the presumption or by proof introduced at the hearing, that its toy designs are original. Accordingly, said copyrights are valid unless it can be found that plaintiff's non-compliance with the notice provisions of Title 17 have rendered their copyrights invalid.

■ In this respect, Section 401(a) and (b) of Title 17 are of prime importance. Said sections provide:

(a) *General Requirement.*—Whenever a work protected under this title is published in the United States or elsewhere by authority of the copyright owner, a notice of copyright as provided by this section shall be placed on all publicly distributed copies from which the work can be visually perceived, either directly or with the aid of a machine or device.

(b) *Form of Notice.*—The notice appearing on the copies shall consist of the following three elements:

(1) the symbol © (the letter C in a circle), or the word "Copyright", or the abbreviation "Copr."; and

(2) the year of first publication of the work; in the case of compilations or derivative works incorporating previously published material, the year date of first publication of the compilation or derivative work is sufficient. The year date may be omitted where a pictorial, graphic, or sculptural work,

with accompanying text matter, if any, is reproduced in or on greeting cards, postcards, stationery, jewelry, dolls, toys, or any useful articles; and

(3) the name of the owner of copyright in the work, or an abbreviation by which the name can be recognized, or a generally known alternative designation of the owner.

As has been noted, each of the exhibits of the plaintiff's toys has attached to it the proper copyright notice label. Each label has a small "c" in a circle on it and, immediately under said mark, appears the name "Dollcraft Industries, Ltd." followed by "New York, New York". Furthermore, Ms. Greene and Mr. Marchisello testified to the strong efforts made by Dollcraft to insure compliance with the statutory notice requirements. In light of the foregoing, plaintiff has come forward with positive evidence that in fact the published copies of the works have contained the required notice. According to Professor Nimmer, and the Second Circuit in *Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409 (2d Cir. 1970), *cert. denied*, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971), at this point, the burden shifts to the defendant to show that the plaintiff published its toys with insufficient notice.

Here, the defendant has not met this burden. Although Mr. Catapano's affidavit stated that he had purchased plaintiff's toys without the proper copyright notice labels attached thereto, as has already been noted, absolutely no physical or testimonial evidence was offered to substantiate this assertion. Although the defendant herein was not ordered by the Court to produce the alleged unlabeled toy he purchased, as was the case in *Herbert Rosenthal Jewelry Corp. v. Grossbardt*, 436 F.2d 315 (2d Cir. 1970), the Second Circuit's observation therein that neither the toy was produced nor the source from which it came revealed has relevance to this case. *Id.* at 317. Furthermore, as has been noted, Mr. Catapano's testimony at the hearing cast his affidavit statement in a somewhat unfavorable light. While it is true that the plaintiff's right is wholly statutory and thus turns on proof of compliance with the notice statute, under the facts which have been elicited thus far, it cannot be said for purposes of this hearing that plaintiff's copyright was invalidated by non-compliance with the statutory notice provisions.

■ Having found that the plaintiff's copyrights are valid, I turn next to the issue of whether the plaintiff will probably succeed on the merits on the claim of infringement. In order to find an infringement, the plaintiff must show that the defendant copied his toys. *Novelty Textile Mills, Inc. v. Joan Fabrics Corp., supra* at 1092. A plaintiff usually does this by showing that the defendant had access to his toys and that the defendants' toys are substantially similar to the plaintiff's. *Id.* In the instant case, the defendants have admitted that the plaintiff's toys were "knocked off." Indeed, the evidence shows that prior to Well-Made's manufacturing of the accused toys, its president actually viewed the plaintiff's toys. Thus, access has undoubtedly been proved. *See id.* at 1092.

■ As to substantial similarity, in *Peter Pan Fabrics, Inc. v. Martin Weiner Corporation*, 274 F.2d 487 (2d Cir. 1960), Judge Learned Hand stated that substantial similarity exists where

the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.

*Id.* at 489. More recently, in *Ideal Toy Corp. v. Fab-Lu, Ltd.*, 360 F.2d 1021 (2d Cir. 1966), the Second Circuit held that the issue of the existence of substantial similarity

is a factual question and the appropriate test for determining whether substantial similarity is present is whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.

*Id.* at 1022. As Judge MacMahon stated in the *Fisher-Price* case:

In applying this test, we do not examine the dolls detail by detail, counting those details which, upon close inspection,

appear similar. Rather, we look to the overall appearance of the dolls to see if the combination of these details creates a general impression of substantial similarity.

*Fisher-Price Toys v. My-Toy Co., supra* at 220.

■ As has been extensively noted previously, an examination of each pair of toys at issue compels the conclusion that the average lay observer would find substantial similarity between the toys in each pair. Here, the Court is not dealing with a partial copying of only certain subtle and perhaps common features. Instead, the Court is faced with a duplication in total of the plaintiff's expression. Indeed, the defendants have not come forward with evidence of independent creation but, instead, apparently concede the substantial similarity between the pairs of toys. As has been noted as a finding of fact, where differences do exist between the toys, they are minor. Moreover, as was noted in the *Fisher-Price* case, the nature of these differences "appear to be the result of a calculated but thin attempt to disguise the copying of plaintiff's dolls," *id.* at 221, and, as was noted by the Second Circuit in the *Novelty Textile Mills* case, such differences "only [tend] to emphasize the extent to which the defendant has deliberately copied from the plaintiff", *Novelty Textile Mills, supra* at 1093 n.4, *quoting Concord Fabrics, Inc. v. Marcus Brothers Textile Corp.,* 409 F.2d 1315, 1316 (2d Cir. 1969).

■ According to the holding in *Thomas Wilson & Co. v. Irving J. Dorfman Co., supra* at 411, proof of ownership of a validly issued copyright coupled with proof of the defendant's copying constitutes a prima facie case for infringement. Under the directives of *Houghton Mifflin Co. v. Stackpole Sons, Inc.,* 104 F.2d 306 (2d Cir.), *cert. denied,* 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 (1939), "if the plaintiff makes a prima facie showing of his right, a preliminary injunction should issue." *Id.* at 307. And, as has been noted, said injunction can issue without a detailed showing of irreparable harm. *Rushton, supra* at 436. Although no testimony was directly elicited on the issue of plaintiff's irreparable harm, the affidavit of Joseph Weiss, the president of Dollcraft, in substance stated that the critical selling season of the toy industry begins in July of each year and, in view of the fluctuating, unpredictable nature of a toy's commercial popularity, not only will the plaintiff's business suffer but the plaintiff's good name will be immeasurably injured if Well-Made is permitted to continue manufacturing, selling and distributing the accused toys. In light of the fact that the *Rushton* Court held that the uncontroverted allegation by the plaintiff "that the market for their toy is seasonal and likely to be exhausted by Easter," *Rushton v. Vitale, supra* at 436, was a sufficient showing of irreparable harm, the plaintiff herein has made a sufficient showing of irreparable harm. In view of the foregoing, plaintiff has met the first prong of the *Sonesta* test and is entitled to the issuance of a preliminary injunction.

In this respect, it is to be noted that this Court has taken into account the defendants' declaration on page 12 of the transcript that the granting of such relief will "put us in a position where we will be virtually out of business. . . . If he wins on a temporary injunction, he's destroyed us." However, there is absolutely no evidence that an injunction might work an injury to the defendant out of proportion to the damages which might result to the plaintiff by failure to issue the requested preliminary injunction. Indeed, defendants' statement is severely undercut by the fact that Well-Made sells approximately one hundred other toys dissimilar from the five accused toys. Consequently, I fail to see how the defendants' business will be ruined or even handicapped by the granting of the requested injunction which is directed to only five of its toys.

Therefore, for all of the foregoing reasons, it is

ORDERED that the defendants, their agents, servants, employees, assigns, attorneys, representatives, successors in business, confederates, and all persons acting for, with, by, through or under the defendants

or controlled by defendants be and are hereby enjoined during the pendency of this action from infringing plaintiff's toy animals, Exhibits 2, 3, 4, 5, 6 with copyright registrations numbered VA 805, VA 951, VA 952, VA 466 and VA 465, respectively, in any manner and from making, advertising, distributing, selling, or otherwise using any copies of the accused toys, Exhibits 13, 14, 15, 16 and 17; and it is further

ORDERED that the aforementioned parties be and are hereby directed to deposit with the U.S. Marshal any and all accused toys as are represented by Defendants' Exhibits 13, 14, 15, 16 and 17, which are in their possession, under their control, or which can be obtained by them through reasonable efforts, together with any and all molds or patterns which are used in manufacturing the whole or any part or parts of the aforesaid exhibits, said items to be held by the U.S. Marshal pending the disposition of this action on the merits. As used in this paragraph, the term "accused toy" means finished goods and all work in process, including but not limited to individual heads, bodies, arms, and legs which have not as yet been assembled into a unified toy. Said term, however, does not include raw materials which have not as yet been utilized in the manufacture of the aforementioned exhibits. The cost of said impoundment at the present time, is to be borne by defendants. However, if it is later determined that the plaintiff is not entitled to the issuance of a permanent injunction, the defendants, as the ultimately prevailing parties, would be entitled to reimbursement; and it is further

ORDERED that the aforementioned orders will not become effective until plaintiff has posted a bond in the amount of $20,000; and it is further

ORDERED that the plaintiff's request for attorneys' fees is presently denied without prejudice and with leave to renew.