**MIDWAY MFG. CO., an Illinois corporation, Plaintiff,**

v.

**Dale DIRKSCHNEIDER and Harold Peterson, individually and d/b/a A-1 Machines, a Nebraska proprietorship; Gerrit Kraayenbrink, individually and d/b/a Soo Valley Dist. Co.; and Venture Line, Inc., an Arizona corporation, Defendants.**

Civ. No. 81-0-243.

United States District Court,
D. Nebraska.

July 15, 1981.

Lindsey Miller Lerman, Omaha, Neb., David A. Gerber, Los Angeles, Cal., Eric C. Cohen, Chicago, Ill., for plaintiff.

Mark Hunter, Omaha, Neb., for defendants Dale Dirkschneider and Harold Peterson, individually and doing business as A–1 Machines.

Dennis Thomte, Omaha, Neb., for defendants Gerrit Kraayenbrink, individually and doing business as Soo Valley Distributing Company, and Venture Line, Inc.

## MEMORANDUM

URBOM, Chief Judge.

The plaintiff, Midway Manufacturing Co., is a manufacturer of coin-operated electronic video games. Midway has obtained copyright registrations on many of these games, including Galaxian, Pac-Man, and Rally-X. The plaintiff alleges that the defendants [1] are engaged in the manufacture, distribution, and sale of video games which are virtually identical to the plaintiff's Galaxian, Pac-Man and Rally-X games. The plaintiff contends that the conduct of the defendants infringes the plaintiff's copyrights, violates the Lanham Act, and violates the Nebraska Deceptive Trade Practices Act. For relief, the plaintiff seeks damages and an injunction prohibiting future infringement.

On April 30, 1981, Judge Robert V. Denney issued an ex parte temporary restraining order [Filing # 17]. He also issued an order directing the United States Marshal to impound any allegedly infringing articles in the possession of the defendants [Filing # 9]. On May 18, 1981, a hearing was held before Judge Denney on the plaintiff's request for a preliminary injunction [Filing # 1]. Upon Judge Denney's hospitalization and death the case has been reassigned to me, and the parties have agreed to my resolving the matter of preliminary relief on the basis of the record already made, but requested oral arguments. Such arguments were held on July 3, 1981, and the issue of preliminary relief is now ready for resolution. The following discussion constitutes this court's findings of fact and conclusions of law on the plaintiff's request for preliminary relief.

I. Findings of Fact.

1. The plaintiff, Midway Manufacturing Co., is an Illinois corporation having its principal place of business at Franklin Park, Illinois. The plaintiff is a designer and manufacturer of coin-operated electronic video games. In the United States, Midway sells its video games to regional distributors who sell the video games to operators. The operators place the machines in arcades and other places for public use. [Tr. 80, 91].

2. Venture Line, Inc. [Venture Line] is an Arizona corporation. Its primary business is the manufacturing of printed circuit boards for coin-operated electronic video games. These printed circuit boards are sold to businesses which manufacture audiovisual games using Venture Line's circuit boards. Venture Line does not manufacture any video games. [Ex. # 25, pp. 15, 73–74, 162–62].[2]

3. Defendant Gerrit Kraayenbrink is the president of Soo Valley Vending, Inc. [Soo Valley Vending]. This corporation has a place of business at 440 Sixth Street, Northwest, Sioux Center, Iowa. Soo Valley Vending was incorporated six or seven years ago and has been in the business of operating coin-operated electronic video games since its formation. [Ex. # 26, pp. 6, 8–10, 11].

4. In the latter half of 1980, Soo Valley Vending began to assemble and distribute

---

1. The plaintiff's complaint names Venture Line, Inc., as a defendant. The Court, however, has no personal jurisdiction over Venture Line, Inc. This corporation, therefore, will not be identified as a defendant in this Memorandum Opinion.

2. Unless otherwise indicated, all references are to the plaintiff's exhibits.

coin-operated video games under the name Soo Valley Distributing Co. [Soo Valley Distributing]. In April of 1981, Soo Valley Distributing was incorporated. The capitalization of this new corporation was based in part on a payment of $39,000.00 from Soo Valley Vending. This payment did not give rise to any indebtedness on the part of Soo Valley Distributing to Soo Valley Vending. [Ex. # 26, pp. 16–18, 19–20, 21–22, 110–14].

5. Soo Valley Distributing is in the business of assembling and distributing coin-operated video games. The printed circuit boards which are incorporated in these games are purchased from a number of sources including Venture Line. The assembled games are either sold to distributors or are placed on routes operated by Soo Valley Vending. [Ex. # 26, pp. 6, 8–10, 59, 79–80].

6. The relationship between Soo Valley Vending and Soo Valley Distributing has remained close. In addition to operating out of the same building, the corporations share corporate officers and shareholders. Defendant Kraayenbrink is the president of Soo Valley Distributing. Kraayenbrink, his son, Henry, and Harlan Bootsma each own equal shares in both Soo Valley Vending and Soo Valley Distributing, and all three are officers and directors of Soo Valley Distributing and Soo Valley Vending. [Ex. # 26, pp. 6, 7–8, 11–12, 14–15, 18–19].

7. Defendants Dale Dirkschneider and Harold Peterson are residents of the State of Nebraska and partners in a partnership operated under the name "A–1 Machines." A–1 Machines has a place of business at 620 South Saddle Creek, Omaha, Nebraska. The business of A–1 Machines includes the operation and distribution of coin-operated electronic video games. A–1 Machines purchases some of the video games it operates and distributes from Soo Valley Distributing. [Ex. # 27, pp. 2–4, 5, 9–10; Ex. # 28, p. 2].

8. The audiovisual games involved here consist of a cabinet containing electronic circuitry and a television picture tube which serves as a screen upon which the visual images of the game are shown. The electronic circuitry is in the form of printed circuit boards and other electronic components which cause the images of each game to be seen on the screen and generate the sounds of each game. The printed circuit board for each game is loaded with electronic components. These components include computer chips, called ROMs, PROMs and EPROMs by those in the trade.[3] The PROMs store the information which produces the games' images and sounds. This information includes the field on which the game is played, the design of the playing symbols or images seen on the screen, their interactions with one another, and the accompanying musical and sound effects. A game may be copied by electronically copying the PROMs. [Tr. 55–56; Ex. # 17, ¶ 2; Ex. # 25, pp. 29–30, 81; Ex. # 26, pp. 25–31].

9. Prior to the insertion of a coin, the video games operate in a repeating attract mode which summarizes each game for prospective players. When a coin is deposited and the start button is depressed, the game shifts into the play mode. In the play mode, some of the playing symbols or images on the screen are responsive to operation of the player control panel, and others move in a predetermined sequence and interact with the player-controlled images in a preset manner. [Ex. # 17, ¶ 3; Ex. # 26, p. 36].

10. The market for audiovisual games is very unpredictable. A game's commercial popularity often terminates abruptly after a short period of time. The average game generally would lose its appeal within a year of being introduced on the market. [Ex. # 17, ¶ 12].

11. The elements of the Galaxian video game appear on a background star pattern consisting of twinkling colored lights that roll from the top of the screen to the bottom. The game involves a missile-firing rocket ship operated by the player, plus a formation of enemy aliens. The aliens are arranged in a convoy of five horizontal

**3.** ROMs, PROMs, and EPROMs are hereinafter referred to as "PROMs".

rows. There are four denominations or ranks of. aliens, with the highest ranking nearest the player's ship. Each rank has a distinguishing color. The highest ranking alien is shaped like a rocket ship, but the other ranks have flapping wings. Individual aliens unpredictably invert and swoop down to bomb the player's ship. Sometimes the alien attack consists of miniformations involving the alien flagship or chief, as well as flying alien escorts. Whenever a ship is destroyed, a bright explosion appears on the screen, with appropriate sound effects. The player's score is measured by the number and rank of aliens destroyed. [Ex. # 17, ¶ 5; Ex. # 18].

12. The Galaxian video game was created by Namco in 1979, and was first published by Namco on September 15, 1979, in Japan. Midway became aware of Galaxian at a private showing at Namco's offices in Tokyo on October 17, 1979. Because of the game's unique features, Midway decided to acquire rights in the game. [Tr. 82–83; Exs. # 11, # 12; Ex. # 17, ¶ 5].

13. In an assignment dated February 2, 1980, Namco assigned all United States rights in Galaxian to Midway. The consideration for this assignment was the payment of substantial advances and royalties. The amount of payments made through March of 1981 has amounted to approximately 3.5 million dollars [Tr. 83–84; Ex. # 10].

14. Since February, 1980, the plaintiff has sold in excess of forty thousand Galaxian video games. Each Galaxian video game has a notice of Midway's claim of copyright, the name of the game, and Midway's name. The notice is affixed near the screen of the video game. [Tr. 99–100, 107; Ex. # 17, ¶ 11; Ex. # 18].

15. The plaintiff made video tape recordings of the audiovisual presentation of the Galaxian play and attract modes. The video tapes were made in Franklin Park, Illinois. The video tapes and applications to register the copyright on the Galaxian au-

diovisual work were submitted by Midway to the Copyright Office. A certificate of copyright registration, No. PA59–977, effective March 6, 1980, was issued for the audiovisual work found in the Galaxian's play mode. A second certificate of registration, No. PA68–323, effective May 23, 1980, was issued for the audiovisual work found in the Galaxian's attract mode. [Tr. 94–95; Ex. # 11; Ex. # 12].

16. The Pac-Man video game centers on a maze which covers the entire screen. The player guides the Pac-Man character through the maze. Points are scored when the Pac-Man eats dots in his path. Four ghost monsters, Inky, Blinky, Pinky and Clyde, chase after the Pac-Man, trying to capture and deflate him. The Pac-Man can counterattack by eating a big power capsule that enables him to overpower the monsters for additional scores. After all the dots are gobbled up, the screen is cleared, and the Pac-Man game continues for another round. Each round or rack features a special fruit target in the maze, which, if eaten, earns bonus points. Audio and musical effects accompany the play of the game. [Tr. 113; Ex. # 17, ¶ 7; Ex. # 19].

17. The Pac-Man video game was created by Namco in 1980 and was first published by Namco on May 22, 1980, in Japan.[4] At the invitation of Namco, Midway representatives first viewed the Pac-Man game in Japan on August 13, 1980. This showing convinced Midway's representative that the game's extraordinary presentation made it a good target for acquisition. [Tr. 84–85; Ex. # 15; Ex. # 17, ¶ 6].

18. An assignment dated October 10, 1980, gave Midway all United States rights in Pac-Man. The consideration for this assignment was the payment of substantial advances and royalties. To date, the plaintiff has paid over 1 million dollars for use of Namco's rights in the Pac-Man and Rally-X video games. [Tr. 86–87; Ex. # 13; Ex. # 17, ¶ 4].

---

4. When originally developed by Namco, the game was called "Puck Man." Namco and Midway, however, later agreed that the game would be marketed in the United States under the name "Pac-Man." Tr. 85, 104–05].

19. Twenty-five thousand Pac-Man games have been sold by Midway since February, 1980. Each game has a notice of Midway's claim of copyright, the name of the game, and Midway's name. The copyright notice is affixed near the screen and is also contained in the game's attract mode. [Tr. 99–100, 107; Ex. # 17, ¶ 11; Ex. # 19].

20. A video tape recording of the audiovisual presentations of the Pac-Man attract and play modes was made by the plaintiff in Franklin Park, Illinois. Midway submitted this video tape and an application to register the copyright on the Pac-Man audiovisual work to the Copyright Office. A certificate of copyright registration, No. PA 83–768, effective November 13, 1980, was issued for the audiovisual work found in the Pac-Man attract and play modes. [Tr. 94–95; Ex. # 15].

21. Rally-X is a combination maze chase and race game. Each player begins the game with a full fuel tank. The object of the game is to drive a car through the maze clearing various checkpoint flags before the fuel is exhausted. Increasing point values are scored for each checkpoint flag cleared. The player is aided in his race through the maze by a radar screen which shows the position of the checkpoint flags and red pursuit cars. This radar is necessary because, unlike Pac-Man, the entire Rally-X maze is not projected on the screen. Rather, the player only views the area of the maze over which his car is passing. The red pursuit cars try to wreck the player's car. The player can outmaneuver the pursuit cars by releasing a smoke screen that causes the cars to spin and stall. If the pursuit cars run into the player's car, an explosion effect and the word "BANG" appear on the screen. The play of the game is accompanied by sound effects and music. [Tr. 114–15; Ex. # 17, ¶ 8, Ex. # 20].

22. The creator of the Rally-X game is Namco. The first publication of the game occurred in Japan on October 3, 1980. At the invitation of Namco, Midway representatives first viewed the Rally-X game in Japan on August 13, 1980. Midway's repre-sentatives were impressed by the Rally-X's extraordinary presentation and decided that the game was a good target for acquisition. [Tr. 84–85; Ex. # 16,; Ex. # 17, ¶ 6].

23. An assignment dated October 10, 1980, gave Midway all United States rights in Rally-X. The consideration for this assignment was the payment of substantial advances and royalties. To date, the plaintiff has paid over 1 million dollars for the use of Namco's rights in Pac-Man and Rally-X. [Tr. 86–87; Ex. # 14, Ex. # 17, ¶ 4].

24. Twenty-five hundred Rally-X video games have been sold by Midway. Each game has a notice of Midway's claim of copyright, the name of the game and Midway's name. The copyright notice appears on the screen after a coin is inserted in the game. [Tr. 99–100, 107; Ex. # 17, ¶ 11; Ex. # 20].

25. Midway has made a video tape of the attract and play modes of the Rally-X game. This tape was made in Franklin Park, Illinois. This tape and an application to register the copyright on the Rally-X audiovisual work were submitted by Midway to the Copyright Office. A certificate of copyright registration, No. PA 88–049, effective January 6, 1981, was issued for the audiovisual work found in the Rally-X attract and play modes. [Tr. 94–95; Ex. # 16].

26. The promotion of the Galaxian, Rally-X and Pac-Man games followed Midway's standard marketing procedure. Midway's standard procedure for marketing a new video game includes distributing thousands of brochures for the game to each of Midway's United States distributors. Each brochure is in full color, and contains prominent displays of the name of the game and explicit pictorial and graphic representations of the visual elements of the game. These brochures, in turn, are used by the distributor to advertise and promote the new game to the distributor's customers, who are generally operators.

Midway also places advertisements in trade magazines, such as Replay, Play Meter, Vending Times, Market Place and Canadian Coin Box. The advertisements are

similar to Midway's brochures. Midway promotes its new games at national and local trade shows. Finally, Midway distributes promotional items such as mugs and T-shirts. [Tr. 88–89, 90–93; Ex. # 17, ¶ 9; Filing # 14 attachments].

27. Midway has invested over 20 million dollars in parts, inventory and equipment for the mass production of the Galaxian, Pac-Man and Rally-X video games. [Ex. # 17, ¶ 10].

28. The defendants' Galactic Invaders game is for all practical purposes identical to the plaintiff's Galaxian game.[5] A few of the specific similarities between the games are discussed below to illustrate the extent to which they are the same. This discussion is not intended to list all the similarities between the games.

The attract mode of these games may be divided into two parts. The first part of the attract mode is a display of the alien attackers and the amount of points scored for destroying them. The shape of the aliens in the Galactic Invaders game is identical to the shape of the aliens in the Galaxian game and the points awarded are the same. In addition, the manner in which these aliens are presented is the same in each game. The only difference between the games in this part of the attract mode is that the defendants' game does not have certain nonessential textual material found in the plaintiff's game.

The second part of the attract mode is a demonstration of how the game is played. The only difference between the games in this part of the attract mode is that the Galaxian demonstration varies, whereas the Galactic Invader demonstration is always the same. This difference is so minute that it would not be noticed unless the games were subject to a side-by-side comparison.

In addition to the attract mode, the sound effects of each game are identical. Among the distinctive sound effects common to both games are: the musical sound activated when the play button is pushed; the pulsating sound heard throughout the play mode; the sound heard when the aliens swoop out of the convoy to attack; and the explosion and other sound effects heard when the player's ship is destroyed.

The play modes of each game are also virtually identical. This may be illustrated by placing the player's ship in the center of the screen. If the game is put into the play mode and the player's ship is not moved, each game's aliens, with one minor exception, will attack the player's ship in the same sequence and destroy the ship in the same manner. [Ex. # 2; Ex. # 18].

29. Soo Valley Distributing manufactures a game called "Kamikaze III" which the plaintiff contends is the same as Galaxian. Although the Court has not had the opportunity to view this game, the evidence presented shows that the games are very similar.

A videotape of a Kamikaze III attract mode shows that the attract mode of this game is virtually identical to the Galaxian attract mode. Other than minor textual differences, the Kamikaze III's manner of presenting the aliens and their respective values is identical to the Galaxian attract mode. The number and shape of the aliens are the same. In addition, the demonstration of the play of the game appears to be the same in each game. The size and configuration of the convoy are the same. The manner in which the aliens leave the convoy to attack is also very similar, although Kamikaze III aliens move faster. Thus, aside from a couple of minor differences, the attract mode of the Galaxian and Kamikaze III are the same.

In the play mode, two features differentiate the play of the Galaxian and the Kamikaze III. First, the Kamikaze III plays faster. This difference in play is reflected in the faster speed of the aliens leaving the convoy and the greater number of bombs released. Second, the number of aliens leaving the convoy to attack is larger in the

---

**5.** Unlike the Galaxian, the Galactic Invaders game offered into evidence is not in color. [Ex. # 2].

Kamikaze III game. Aside from these differences, it appears that the Kamikaze III play mode is identical to the Galaxian play mode. [Ex. # 18; Ex. # 24; Ex. # 26, pp. 39–42; Ex. # 25, pp. 46–53].

30. The defendants' Mighty Mouth game is, for all practical purposes, identical to the plaintiff's Pac-Man game. A few of the specific similarities between the games are discussed below to illustrate the extent to which the games are the same. This discussion is not intended to list all the similarities between the games.

The attract mode of the Mighty Mouth game contains the only readily apparent differences between the games. The names of the Mighty Mouth characters are different from the names given the Pac-Man characters. The other difference is the speed at which the attract modes run. The Mighty Mouth attract mode runs somewhat faster than the Pac-Man. This difference in speed can only be observed when the games are viewed side-by-side.

In all other respects, the attract modes of each game are identical. The color and shape of the characters of each game are the same. The maze through which these characters move is the same color and configuration. Each game presents these characters in identical fashion. The attract modes demonstration of the games' play is identical. The monster character and the player puck in each game's demonstration moves in the same directions and stop at the same place.

The sound effects of each game are also the same. Several of these sound effects deserve brief mention because of their distinctive qualities. Each game has the same sound effects when the play button is pushed; when the player puck is gobbling dots; and when the player puck is caught by the monster characters.

The progression of play appears to be identical. If the games are placed in the play mode without moving the player's control stick, the monster characters in each game will move along the same routes and will ultimately destroy the player puck in the same manner. In addition, the visual

display when the player puck eats a power capsule is the same in each game. When this occurs, the monster characters turn a dark blue and race around the maze. Finally, in each game, a player puck which is caught by a monster character deflates and disappears from the screen. [Ex. # 8; Ex. # 9; Ex. # 19].

31. The defendants' Rally-X game is, for all practical purposes, identical to the plaintiff's Rally-X games. A few of the specific similarities are discussed below to illustrate the extent to which the games are the same. This discussion is not meant to list all the similarities between the games.

The attract mode of each game may be divided into two parts. First, the attract modes contain a description of the rules of the games. Aside from the name of the manufacturer, these displays are the same. Second, the attract modes contain a demonstration of the games' play. The color and shape of the cars and maze are the same in each game. The demonstrations are different in that the cars often follow different routes through the maze. This difference, however, can only be observed if the games are compared side-by-side. In all other respects, the attract modes are the same.

The Rally-X play modes are also very similar. The sound effects accompanying the games' play are the same. Particularly striking are the sound effect which is heard when the play button is pushed and the monotonous melody which is played when the cars are moving. In addition, each game has an explosion with the word "BANG" on it when the player's car is destroyed. This explosion is accompanied by an appropriate sound effect. [Ex. # 1; Ex. # 7; Ex. # 10].

32. Soo Valley Distributing has assembled Galactic Invaders, Kamikaze III, Mighty Mouth, and Rally-X video games and conversion kits. The conversion kits were all sold. The video games were sold or were placed on routes operated by Soo Valley Vending. Defendant Kraayenbrink knew that these games were substantially similar to the games manufactured by Mid-

way.[6] He admits that he had received notice of the plaintiff's claim of infringement, but did not cease distributing or operating the allegedly infringing goods. [Ex. # 26, pp. 30, 35–49, 53–54, 60–61, 62, 63–64, 72–73, 75–76, 77–81, 83–85, 86–88, 89–90, 91, 151, 152, 153–54, 104–05, 107, 109, 142–43, 168–71].

33. On at least one occasion, a customer contacted defendant Kraayenbrink to purchase a conversion kit for a Galaxian game. The defendant's response to such an inquiry was to offer to sell the customer a Galactic Invaders conversion kit. He would tell the potential customer that Galactic Invader was the same thing as a Galaxian. [Ex. # 26, p. 136].

34. Soo Valley Distributing and Soo Valley Vending currently own few Galactic Invader, Kamikaze III, Mighty Mouth or Rally-X video games or printed circuit boards. No printed circuit boards are currently on order. [Ex. # 26, pp. 60–62, 121, 143–161].

35. Defendants Peterson and Dirkschneider, through their partnership, A–1 Machines, have purchased Galactic Invaders, Mighty Mouth and Rally-X video games from Soo Valley Distributing. Of these games, all but five have been sold. A–1 Machines is currently operating the remaining machines at various locations. The defendants were aware that these games were similar to the games manufactured by the plaintiff. [Ex. # 27, pp. 14–16, 17, 18, 23–27, 28, 53–54, 55–57, 63; Ex. # 28, pp. 5, 7–9, 13–15, 16].

36. On at least one occasion, a customer called A–1 Machines and asked to purchase a Pac-Man game. Defendant Dirkschneider offered to sell the customer a Mighty Mouth game, explaining that it was similar to the Pac-Man game. The customer ultimately purchased the Mighty Mouth. In Dirkschneider's opinion, one of the selling points of the Mighty Mouth game was its similarity to the Pac-Man game. [Ex. # 28, pp. 7–8, 13–14].

37. A–1 Machines currently owns very few Galactic Invaders, Mighty Mouth or Rally-X video games. The partnership has no outstanding orders to purchase any of these games. [Ex. # 27, pp. 14–16, 19–20; Ex. # 28, pp. 20–21, 25–26].

38. A–1 Machines has received complaints about the performance of its Mighty Mouth game. These complaints came from two young persons who were playing the Mighty Mouth game. They told Dirkschneider that they didn't like the way the game played and that they wanted "a regular factory game." Dirkschneider interpreted this to mean that the customers wanted a Midway game. [Ex. # 28, pp. 8, 17–20].

## II. The Preliminary Injunction Standard

The determination of whether a preliminary injunction should be issued is entrusted to the discretion of the trial court. The factors which should guide the exercise of this discretion are:

> (1) the threat of irreparable harm to the plaintiff; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest.

*Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). No one of these factors is determinative.[7] The

---

**6.** Some of the Mighty Mouth games assembled by Soo Valley Distributing had features different from the Mighty Mouth described above. The Mighty Mouth games with the different features were made from Venture Line printed circuit boards. The Court has viewed a video tape of the attract mode of the Venture Line board [Ex. # 24]. Although this Mighty Mouth is more distinctive than the Mighty Mouth described above, the game is still similar to the plaintiff's Pac-Man game. [Ex. # 25, pp. 124–26].

**7.** The interrelationship of these factors is illustrated by the following passage from *Dataphase*:

> In balancing the equities no single factor is determinative. The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irrep-

Court will therefore discuss each of these factors as it applies to the plaintiff's various causes of action.[8]

## III. Copyright Infringement

### A. Probable Success on the Merits

■ In order to prevail on its claim of copyright infringement, the plaintiff must prove that it is the owner of a valid copyright and that the defendants have performed and distributed games copied from the plaintiff's audiovisual works. *See Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir. 1978); *Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977); *Testa v. Janssen*, 492 F.Supp. 198, 202 (W.D.Pa.1980). For the reasons discussed below, the Court is of the opinion that the plaintiff has established that it will probably succeed on the merits of its infringement cause of action.

#### 1. Validity of Copyright

■ Under the Copyright Act, a certificate of copyright registration, obtained within five years of first publication, constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c) (1976). The plaintiff has offered into evidence its certificates of copyright registration for the audiovisual works contained in the Pac-Man, Galaxian and Rally-X games. These copyright registrations were obtained within five years of the first publication of these works. Through this evidence, the plaintiff has made a prima facie showing that its audiovisual works are copyrightable subject matter, that the works are original, that the statutory formalities of registration have been satisfied, and that the plaintiff is the owner of the copyrights. 3 M. Nimmer, Nimmer on Copyright § 12.11[A], [B], [C] (1980) [hereinafter cited as "Nimmer on Copyright"]. *See also Dollcraft Industries, Ltd. v. Well-Made Toy Manufacturing Co.*, 479 F.Supp. 1105, 1114 (E.D.N.Y.1978). This showing places on the defendants the burden of coming forward with evidence which rebuts the plaintiff's claim to ownership of valid copyrights in its audiovisual works. *Dollcraft Industries, Ltd. v. Well-Made Toy Manufacturing Co., supra*, 479 F.Supp. at 1114.

The primary challenge to the validity of the plaintiff's copyrights concerns the issue of fixation. The defendant argues that the plaintiff's games are not copyrightable because the games' visual displays are merely ephemeral projections on a cathode ray tube. This contention is without merit.

■ The defendants' analysis is defective because it fails to take into account the distinction between the *work* which is the subject of copyright protection and the *tangible medium* in which the work is fixed. *See* 1 Nimmer on Copyright § 2.03[C]. *See also Midway Manufacturing v. Arctic International, Inc.*, No. 80 C 5863, Slip op. at 16 n. 5 (N.D.Ill. June 2, 1981). Because of this distinction, a two-step analysis is required to determine copyrightability. First, the Court must determine whether the plaintiff's works fall within one of the copyrightable subject matters enumerated in the Act. 17 U.S.C. § 102(a). Second, the Court must determine whether the work is fixed in a tangible medium of expression.

■ The plaintiff's games are audiovisual works, and thus are copyrightable subject matter. 17 U.S.C. § 102(a)(6). The Act defines audiovisual works as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any,

arable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the plaintiff has raised a substantial question and the equities are otherwise strongly in his fa-

vor, the showing of success on the merits can be less.
*Id.* at 113.

8. The plaintiff can obtain the relief it requests based on its copyright and Lanham Act claims. The Court will therefore not discuss the plaintiff's state law claim.

regardless of the nature of the material objects, such as films or tapes, in which the works are embodied." 17 U.S.C. § 101. The subject matter of the plaintiff's copyrights are the games' visual displays and accompanying sound effects. The games' visual displays are a series of related images. These images are intrinsically intended to be projected on a cathode ray tube by means of electronic equipment. These characteristics of the plaintiff's games clearly establish that the plaintiff's works are copyrightable audiovisual works.

Although the plaintiff's games consist of copyrightable subject matter, they are not copyrightable unless they are fixed. The Act provides that copyright protection may be obtained "in original works of authorship *fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.*" 17 U.S.C. § 102(a) (emphasis supplied). A work is fixed in a tangible medium of expression "when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. The Act contains no restrictions on the type of material objects suitable for fixation. *See* 1 Nimmer §§ 2.03[B][1], 2.09[D][1]. *See also* H.Rep.No.94–1476, 94th Cong., 2d Sess. 52 (1976) *reprinted in* [1977] U.S.Code Cong. & Ad.News 5665.

■ Under these statutory provisions, it is clear that the plaintiff's audiovisual works are fixed in the printed circuit boards. The printed circuit boards are tangible objects from which the audiovisual works may be perceived for a period of time more than transitory. The fact that the audiovisual works cannot be viewed without a machine does not mean the works are not fixed. The Court therefore is of the opinion that the plaintiff's audiovisual works are fixed, and thus may be copyrighted.

■ The defendants' second challenge to the validity of the plaintiff's copyrights focuses on the distinction between an idea and an expression. Under the Act, a copyright holder may not monopolize an idea, but is limited to protecting his expression of an idea. 17 U.S.C. § 102(b). *See generally, Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 912–13 (2d Cir. 1980); *Franklin Mint Corp. v. National Wildlife Art Exchange*, 575 F.2d 62, 64–65 (3d Cir. 1978), *cert. denied* 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978); *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1163, 1167–69 (9th Cir. 1977). The defendants contend that the plaintiff is attempting to use its copyrights to monopolize an idea. As an example, the defendants suggest that the plaintiff's Galaxian copyright is an attempt to monopolize "the very idea of a video game in which alien ships break away from a convoy to attack a defender ship." Defendants' Brief of May 15, 1981, at p. 7. The Court disagrees.

■ The plaintiff's copyrights cover the plaintiff's audiovisual expression of various game ideas. This expression includes the distinctive color and design of the space ships and other players, as well as the sounds accompanying the playing of the games. Such expressions of game ideas are an appropriate subject of copyright protection. *See Midway Manufacturing v. Arctic International, Inc., supra*, Slip op. at 13–14, 1 Nimmer on Copyright § 2.18[H][3]. *Cf. Durham Industries, Inc. v. Tomy Corp., supra*, 630 F.2d at 914–15 (illustrates how identical games may be expressed in different ways).

■ In addition to challenging the subject matter of the plaintiff's copyrights, the defendants also raise the issue of whether the plaintiff has complied with the statutory formalities of copyright registration. The Act requires that a copyright applicant submit, "in the case of a work first published outside the United States, one complete copy or phono-record as so published." 17 U.S.C. § 408(b)(3). The plaintiff has submitted to the Copyright Office a video tape of each of its games in their attract and play modes. These video tapes were made in the United States.

Video tapes are "copies" within the meaning of that term as defined in the Act. 17 U.S.C. § 101. The defendants, however, contend that the videotapes submitted by the plaintiff are not copies of the works as first published in Japan. The defendants have offered no evidence which suggests that the games which were video taped were not the same as those first published in Japan. In light of the presumption of validity given to the plaintiff's copyrights, the Court is of the opinion that the defendants have failed to prove noncompliance with the requirements of 17 U.S.C. § 408(b)(3).

The remaining issues raised by the defendants do not concern the validity of the plaintiff's copyrights. These issues instead concern the question of whether the plaintiff may properly bring this action, even if its copyrights are valid. Since the remaining issues do not directly concern the validity of the copyrights, the presumption of validity which accompanies the copyright registration has no application. These remaining issues, however, are closely related to the validity issue, and will therefore be considered in connection therewith.

■ A copyright registration is a prerequisite to the institution of an infringement suit. 17 U.S.C. § 411(a). The defendants contend that the plaintiff has failed to satisfy this requirement because no copyright registration has been obtained in the computer programs underlying the plaintiff's games. The basis of this contention is the defendants' argument that the instant action is not a suit to prevent the infringement of the plaintiff's audiovisual works, but is rather a suit to protect the computer programs contained in the games' printed circuit boards. Since the computer programs are not the subject of a copyright registration, the defendants conclude that the plaintiff cannot bring the instant action. A challenge, very similar to the one raised by the defendants, was rejected by the United States District Court for the Eastern District of New York. *Stern Elec-*

tronics, Inc. v. Harold Kaufman, et al., 523 F.Supp. 635, 638–639 (E.D.N.Y.1981). For the reasons discussed in *Stern Electronics,* the Court finds that the plaintiff's failure to obtain copyright registrations on the computer programs underlying its audiovisual works does not preclude the plaintiff from bringing a suit to prevent infringement of its audiovisual works.

■ The defendants' final contention concerns the issue of notice. The Act provides that "[w]henever a work protected under this title is published·in the United States or elsewhere by authority of the copyright owner, a notice of copyright as provided by this section shall be placed on all publicly distributed copies from which a work can·be visually perceived, either directly or with the aid of a machine or device." 17 U.S.C. § 401(a). The plaintiff's copyright registration is not prima facie evidence that the notice requirement has been satisfied.[9] The plaintiff therefore has the burden of coming forward with evidence that proper notice has been given. *Dollcraft Industries, Ltd. v. Well-Made Toy Manufacturing Co., supra,* 479 F.Supp. at 1116.

■ The plaintiff's Galaxian and Pac-Man games have copyright notices affixed to their cabinets near their viewing screens. In addition, the Pac-Man and Rally-X games have copyright notices which are projected on their cathode ray tubes. The Pac-Man notice is contained in the attract mode. The Rally-X notice appears on the screen after the coins have been inserted but before the play mode commences. The defendants contend that plaintiff has failed to comply with the Act's notice requirements because the plaintiff has failed to place notices on the games' printed circuit boards.

Under the Copyright Act, the copyright notice must be placed "on the copies in such manner and location as to give reasonable notice of the claim of copyright." 17 U.S.C. § 401(c). Although the Act apparently re-

---

**9.** The copyright registration is prima facie evidence that copies published prior to the regis-

tration had appropriate copyright notice. *See* 3 Nimmer on Copyright § 12.11[B].

quires fixation on the copies of the works, the proposed regulations for this section provide that the copyright notice requirement is satisfied, for works embodied in printed circuit boards, by including the notice within the visual display of the work or by affixing the notice to the terminal where the work is displayed. 37 C.F.R. § 201.-20(g)(1) & (3) *reprinted in* 4 Nimmer on Copyright Appendix 3. This proposed regulation clearly comports with the spirit of § 401(c) of the Act since the regulation would place the notice where it would be most likely to be observed by those viewing the work. Although the proposed regulations are not binding on the Court, they do suggest a persuasive interpretation of the requirements of § 401(c). The Court therefore finds that the plaintiff has satisfied the Act's notice requirements for each of its games.

### 2. Copying of the Plaintiff's Work

■ The second element of an infringement action is copying of the plaintiff's work. For the purposes of this case, the copying requirement should be divided into two parts. *See* 2 Nimmer on Copyright § 8.01[A]. First, the plaintiff must prove that the defendants' games are copies of the plaintiff's games. In other words, the plaintiff must show that the allegedly infringing games did not have an origin independent of the plaintiff's works. Second, the plaintiff must establish that the defendants' conduct infringed one of the plaintiff's rights enumerated in the Act. In this regard, the plaintiff contends that the defendants infringed its rights to exclusive distribution and performance of its audiovisual works. 17 U.S.C. § 106(3) & (4).

■ Because of the difficulty of producing direct evidence of copying, a plaintiff in a copyright action generally proves copying "by showing that the person who composed the defendants' work had access to the copyrighted work and that the defendants'

work is substantially similar to the plaintiff's." *Ferguson v. National Broadcasting Co., supra,* 584 F.2d at 113. However, if the similarity between the works is so striking that the possibility of independent creation is precluded, a court may find that copying occurred without direct proof of access. *Ferguson v. National Broadcasting Co., supra,* 584 F.2d at 113; *Testa v. Janssen, supra,* 492 F.Supp. at 202–204; *Knickerbocker Toy Co. v. Genie Toys, Inc.,* 491 F.Supp. 526, 528 (E.D.Mo.1980). In the instant case, the similarities between the works are so striking that copying may be inferred without direct proof of access.

■ A comparison of the defendants' games and the plaintiff's games shows that the games are virtually identical. The Court will briefly discuss a few of the similarities between the games.[10]

The plaintiff's Pac-Man game has four characters or monsters which chase the player puck through a maze. These monsters are colored red, pink, aqua and yellow. They have a semicircular shape with feet or legs on the flat, bottom side, and have eyes which look in the direction of their movement. The design of these characters is unique. The monster characters in the defendants' Mighty Mouth game are identical to those in the plaintiff's game.

The plaintiff's Galaxian game has a convoy of aliens approaching the player's defense ship. These aliens are unique in their shape and movement. In formation, the aliens fly with their gently flapping wings toward the defense ship. When the aliens break away from the convoy to swoop down on the defense ship, their wings are extended upward in a stationary position. Although the defendants' Galactic Invaders game offered in evidence is not in color, the shape and movement of its aliens are identical to the plaintiff's game.

---

10. The burden on the plaintiff of proving that two works are strikingly similar is a heavy one. "To prove similarities are striking, [the plaintiff] must demonstrate that 'such similarities are of a kind that can only be explained by copying, rather than by coincidence, independent creation or prior common source.' " *Testa v. Johnson, supra,* 492 F.Supp. at 203. The illustrative similarities discussed herein clearly satisfy this heavy burden.

The plaintiff's Rally-X game is a chase game in which the player's car is pursued through a maze by several pursuit cars. One way of avoiding the pursuit cars is for the player's car to release a smoke screen which sends the pursuit car into a whimsical spin. The defendants' Rally-X game incorporates a smoke screen escape device and spin-out identical to the plaintiff's.

This list of similarities is intended merely to illustrate the extent to which the defendants' games are similar to the plaintiff's. It is not meant to be exhaustive. It cannot be overemphasized that, in virtually every detail, the defendants' games are identical to the plaintiff's. *See Sid & Marty Krofft Television v. McDonald's Corp., supra,* 562 F.2d at 1164. *See also Franklin Mint Corp. v. National Wildlife Art Exchange, supra,* 575 F.2d at 65–66.

In addition to specific similarities, the overall appearance of the games is identical. A reasonable observer, comparing the overall appearances of these games, could only conclude that the defendants' games not only copy plaintiff's ideas, but capture the plaintiff's unique expression of those ideas. *See generally, Durham Industries, Inc. v. Tomy Corp., supra,* 630 F.2d at 911–13; *Sid & Marty Krofft Television v. McDonald's Corp., supra,* 562 F.2d at 1164–65; *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 907, 908–09 (3d Cir. 1975); *McMahon v. Prentice-Hall, Inc.,* 486 F.Supp. 1296, 1304 (E.D.Mo.1980); *Dollcraft Industries, Ltd. v. Well-Made Toy Manufacturing, supra,* 479 F.Supp. at 1116–17.

In light of the foregoing discussion, the Court finds that the defendants' games are so strikingly similar to the plaintiff's works that a finding of independent origin is precluded. The Court therefore concludes that the defendants' games are copies of the plaintiff's.

The remaining issue to be resolved is whether the defendants have infringed any of the plaintiff's statutory rights. A copyright holder has the exclusive right to distribute to the public copies [11] of his work, and to perform in public the copyrighted work. Both of the defendants have admitted that they sold audiovisual games which the Court has found to be virtually identical to the plaintiff's. In addition, they have testified that they have placed these games on routes where they are regularly in use. Based on these admissions, the Court finds that the plaintiff will probably succeed in proving that the defendants have infringed the plaintiff's right to perform and distribute its copyrighted works. [12]

## B. Irreparable Harm and Balancing of Equities.

Proof of copyright infringement creates a presumption that the copyright holder will suffer irreparable harm. *Novelty Textile Mills v. Joan Fabrics Corp., supra,* 558 F.2d at 1094. The plaintiff has made a strong showing of infringement. Since the defendants have offered no evidence as to the plaintiff's harm, the Court finds that the plaintiff will suffer irreparable harm if an injunction is not issued.

When balancing the equities in a preliminary injunction action, the Court must assess the harm which the injunction would impose on the defendants. The evidence in the instant action suggests that an injunction prohibiting the further distribution or performance of the infringing games would do little harm to the defendants' businesses. The defendants admit that they currently own very few of the infringing games. This evidence suggests

---

11. The defendants did not reproduce copies of the plaintiff's work. Rather, they distributed copies of the work. This distribution occurred when the defendants sold games which housed copies of the plaintiff's work. The copies of the work were the printed circuit boards which contained the plaintiff's work and which were manufactured by Venture Line, Inc.

12. This conclusion is not altered by the defendants' lack of knowledge that its games were copies of plaintiff's games, *see Knickerbocker Toy Co. v. Genie Toys, Inc., supra,* 491 F.Supp. at 529, or by the fact that the defendants did not themselves make the copies which were distributed or performed. See *American International Pictures, Inc. v. Foreman,* 576 F.2d 661, 663 n. 1, 664 (5th Cir. 1978).

that an injunction would have little impact on the defendants' businesses. Moreover, the plaintiff's strong showing of infringement suggests that an injunction would protect the defendants from an ever increasing exposure to liability for damages. *Northwestern Bell Telephone v. Bedco. of Minnesota, Inc.*, 501 F.Supp. 299, 303 (D.Minn.1980).

■ Balanced against the harm to the defendants is the harm suffered by the plaintiff if the injunction is not issued. Allowing the defendants' infringing activity to continue would cause the plaintiff substantial harm. The popularity of audiovisual games is notoriously short-lived. Despite this fact, the plaintiff has invested large sums of money in the acquisition and development of the games in issue here. Without an injunction, the public interest in the plaintiff's copyrighted works may dissipate before plaintiff is able to vindicate its rights. In such a situation, a preliminary injunction is the only effective means of protecting the copyright. *Stern Electronics v. Harold Kaufman, supra*, 637. *See Dollcraft Industries, Ltd. v. Well-Made Toy Manufacturing, supra*, 479 F.Supp. at 1117. The Court therefore finds that the balancing of the equities favors the issuing of an injunction.

### C. The Public Interest

■ The Copyright Act evidences a public interest in encouraging creativity by fostering and rewarding creative expression. By granting the plaintiff the relief requested, the Court would be furthering this public interest by rewarding the plaintiff's development of new and challenging audiovisual games. In addition, one court has noted that counterfeits of copyrighted games post a threat to the health of the video game industry. *Stern Electronics, Inc. v. Kaufman, supra*, 638. The Court can conceive of no public interest served by permitting the defendants to engage in the continued distribution and performance of games which are virtual replicas of the plaintiff's games. The Court therefore finds that the

public interest would be served by the issuance of an injunction.

### D. Summary

■ The plaintiff has made a strong showing of probable success on the merits. This showing is sufficient to establish that the plaintiff will suffer irreparable harm. Balanced against this harm is the rather insubstantial harm which an injunction will cause the defendants. Based on these findings, the Court will issue a preliminary injunction prohibiting the defendants from engaging in further infringing conduct.

## IV. Lanham Act Violations

### A. Probable Success on the Merits

■ The plaintiff's second cause of action is founded on alleged violations of § 43(a) of the Lanham Act. 15 U.S.C. § 1125(a). In order to prevail on this cause of action, the plaintiff must prove: (1) that the plaintiff's games have nonfunctional design features; (2) that these design features have acquired secondary meaning; and (3) that defendants' use of these features is likely to cause confusion in the marketplace.[13] *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1217–21 (8th Cir. 1976), *cert. denied* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). For the reasons discussed below, the Court is of the opinion that the plaintiff will probably succeed on the merits of its Lanham Act cause of action.

#### 1. Nonfunctional Design Features of the Plaintiff's Games.

■ Although the line between functional and nonfunctional design features is not always bright, certain established principles guide the Court's consideration of this issue. In the *Fruehauf* case, the Eighth Circuit held:

"Imitation of the physical details and design of a competitor's product may be actionable, if the particular features imitated are 'non-functional' and have ac-

---

**13.** The defendants do not dispute that this suit involves goods affecting interstate commerce.

quired a secondary meaning.... But, where the features are 'functional' there is normally no right to relief. 'Functional' in this sense might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection."

*Id.* at 1217–18. This passage, however, does not mean that a design feature is nonfunctional only if it serves no utilitarian function. Rather, the circuit court recognized that a design feature, adopted for identification purposes, may be deemed nonfunctional even if it serves some useful purpose. *Id.* at 1218. *Accord Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 201, 203–04 (2d Cir. 1979). The crucial consideration is whether protection against imitation of the design feature will hinder effective competition. *Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1217–21.

The design features in question here are the numerous characters which are found in the plaintiff's games. These characters clearly serve some useful purpose. Without them, the game could not be played. These characters, however, have been given unique shapes and coloring which can only be described as arbitrary embellishments, not essential to the games' operation. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra,* 604 F.2d at 203 n. 4, 203–04; *Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1217–18.

■■■ This conclusion is illustrated by an examination of the plaintiff's Pac-Man game. The characters in the Pac-Man game are fanciful creations having no counterparts in reality. These characters could be given any imaginable shape without changing the basic character of the game. A potential competitor, therefore, could market a game whose operational features are identical to the plaintiff's game without copying the design feature of the plaintiff's characters. Thus, a prohibition against the imitation of the design features of the plaintiff's characters would not hinder effective competition by anyone who wished to market games having operational features identical to the plaintiff's. The Court therefore finds that the shapes and coloring of the characters in the plaintiff's games are nonfunctional.

### 2. Secondary Meaning

■■■ The issue of whether a nonfunctional design feature has acquired a secondary meaning depends on the consuming public's association of that design with goods from a single source. *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1059 (2d Cir. 1979); *see Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1220.

"[A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods * * * may become so associated in the public mind with such goods * * * that it serves to identify them and distinguish them from the goods * * * of others. When such an association exists, the name, mark, or symbol is said to have acquired a 'secondary meaning,' in which the original user has a property right which equity will protect against unfair appropriation by a competitor." * * *

*Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1219. Secondary meaning may be established by circumstantial evidence. *Faberge, Inc. v. Saxony Products, Inc.*, 605 F.2d 426, 428 (9th Cir. 1979).

■ The existence of a secondary meaning may be inferred from evidence that the defendants have consciously imitated the nonfunctional design features of the plaintiff's products. *Faberge, Inc. v. Saxony Products, Inc., supra,* 605 F.2d at 428; *RJR Foods v. White Rock Corp., supra,* 603 F.2d at 1060; *Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1220 n. 13. This inference is based on the expectation that a businessman would not adopt a specific nonfunctional design feature without a purpose. Since the design feature could not have been adopted because of its functional usefulness, the only reasonable motivation for such conscious imitation would be to take advantage of the secondary meaning associated with the design.[14] Absent proof of other motivation, evidence of conscious imitation is sufficient to create an inference that the imitated design feature did in fact have a secondary meaning.

■ Applying this analysis to the instant action, the Court finds that the defendants were aware of the existence of the plaintiff's games and of the similarities between their games and the plaintiff's. The games are for all practical purposes identical. The record also reveals that customers who wished to purchase plaintiff's games from the defendants were offered the defendant's games as substitutes. This substitution suggests that the defendants were attempting to take advantage of consumer interest in the plaintiff's games. Based on this evidence, the Court finds that the defendants consciously imitated the nonfunctional design features of the plaintiff's games with the intent to enjoy some of the consumer acceptance of the plaintiff's games. *See generally Fleischmann Distilling Corp. v. Maier Brewing Co., supra,* 314 F.2d at 157; *Markel v. Scovill Manufacturing Co.,* 471 F.Supp. 1244, 1252 (W.D.N.Y.

1979) *aff'd without opinion* 610 F.2d 807 (2d Cir. 1979); *Armstrong Cork Co. v. Armstrong Plastic Covers Co.,* 434 F.Supp. 860, 871 (E.D.Mo.1977); *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288, 1292–93 (S.D.N.Y.1972). This conscious imitation is evidence that the nonfunctional design features of the plaintiff's games had acquired secondary meaning.

A finding of secondary meaning is also supported by the evidence of consumer complaints about the defendants' games. Dale Dirkschneider testified that customers playing his Mighty Mouth games were not satisfied with the games' performance. These customers told Dirkschneider that they wanted "a regular factory game" which Dirkschneider interpreted to mean a Midway game.

This testimony indicates that something about the appearance of the defendants' games suggested to the customers that their money would purchase a type of game action associated with the plaintiff's games. These customers' beliefs could not have been created by the games' cabinets which are not similar to the cabinets used on the plaintiff's games. Since the attract mode of the defendants' games prominently displayed characters identical to those used in the plaintiff's games, it is reasonable to infer that the customers' expectations were in part engendered by the fact that the defendants' games imitated the nonfunctional design feature of the plaintiff's games. This consumer expectation is evidence that the nonfunctional design features of the plaintiff's games had acquired a secondary meaning. *See Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 503 F.Supp. 647, 649 (S.D.N.Y.1980).

■ There is one other factor which suggests that the design features of plain-

---

**14.** The rationale behind this inference was explained in *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149 (9th Cir. 1963).

We cannot conclude but that Maier deliberately adopted the name knowing that Black & White was the name and trademark of Buchanan and they must have done so with some purpose in mind. The only possible purpose could have been to capitalize upon

the popularity of the name chosen. This popularity, they must have known, would extend to their product because the public would associate the name Black & White with something old and reliable and meritorious in the way of an alcoholic beverage. *Id.* at 157. See also *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.,* 283 F.2d 551, 558 (9th Cir. 1960).

tiff's games have acquired a secondary meaning. The substantial number of games sold by the plaintiff is evidence of secondary meaning. *Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1220. Since early 1980, the plaintiff has sold 40,000 Galaxian games, 25,000 Pac-Man games and 2,500 Rally-X games. From these sales, it may be inferred that customers are familiar with the plaintiff's games, and associate the design features of these games with a single source.[15]

■■■ The preceding discussion summarizes the evidence of secondary meaning.[16] This evidence by no means conclusively establishes the existence of secondary meaning. Although the issue is a close one, the Court is of the opinion that the plaintiff has presented sufficient evidence to establish that it will probably succeed in proving that the nonfunctional design features of its games have acquired secondary meaning.

3. Likelihood of Confusion

■■■ The determination of whether the defendant's conduct is likely to cause confusion depends upon the perceptions of the reasonable consumer. *See RJR Foods, Inc. v. White Rock Corp., supra,* at 1060; *Armstrong Cork Co. v. Armstrong Plastic Covers Co., supra,* 434 F.Supp. at 871.[17] The plaintiff must show that the defendants' use of the plaintiff's game characters is likely to confuse a reasonable consumer about the source of the defendants' games

or the plaintiff's connection with them. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra,* 604 F.2d at 204–05. Whether the plaintiff has satisfied this burden depends upon a variety of factors, no one of which is determinative. *SquirtCo. v. Seven-Up Co.,* 628 F.2d 1086, 1091 (8th Cir. 1980).

■■■ The strength of plaintiff's mark is one factor which should be considered in assessing the likelihood of confusion. *SquirtCo v. Seven-Up Co., supra,* 628 F.2d at 1091. If the plaintiff's mark has strong secondary meaning in the public's mind, the defendants' use of that mark is likely to cause greater confusion than the use of a weaker mark would cause. In the instant case, the showing of secondary meaning does not suggest that the plaintiff's mark has a strong secondary meaning among the consuming public. The weakness of the plaintiff's mark, however, does not mean that likelihood of confusion cannot be proven. Rather, it means that a strong showing on the other factors must be made if the plaintiff is to prevail. *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 445–46 (9th Cir. 1980). The plaintiff has clearly made such a showing.

■■■ One factor which should be considered in assessing the likelihood of confusion is the similarity of the design features used by the parties. The design of the defendants' game characters is virtually identical to the design of the plaintiff's

---

**15.** This conclusion is reinforced by the operational characteristics of the plaintiff's games. Each game has an attract mode which prominently displays the games' characters. This display of the games' characters makes it more likely that the public would associate the characters with games made by the plaintiff. The significance of the attract mode is considered in greater detail in the Court's discussion of likelihood of confusion.

**16.** Advertising is another factor which is relevant to resolving the issue of secondary meaning. *Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1220. The plaintiff has offered evidence of its substantial advertising campaigns designed to promote its games. This advertising was directed primarily at distributors who purchase games from the plaintiff. The plaintiff, however, does not appear to

contend that its games' design features have acquired secondary meaning among distributors. Rather, the plaintiff contends that the games' design features have secondary meaning among those persons who actually play the games. Advertising directed at distributors is of little probative value in proving secondary meaning recognized by ultimate consumers.

**17.** The *Armstrong* case is a trademark infringement action under 15 U.S.C. § 1114(1). Although the current action involves a claim under 15 U.S.C. § 1125(a), cases such as *Armstrong* provide authority for assessing the likelihood of confusion in the instant action. *See generally, Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc.,* 633 F.2d 746, 753 n. 7 (8th Cir. 1980).

game characters. Because of this striking similarity, the overall impression created by the defendants' characters is indistinguishable from the impression conveyed by the plaintiff's characters. *SquirtCo. v. Seven-Up Co., supra,* 628 F.2d at 1091; *RJR Foods, Inc. v. White Rock Corp., supra,* 603 F.2d at 1060. This similarity strongly suggests that the defendants' use of the plaintiff's design features would cause confusion in the marketplace.

The risk of confusion created by the striking similarity of the design features is exacerbated by the manner in which these games operate.[18] Each of the parties' games has an attract mode, which is a display continuously shown on the cathode ray tube whenever the game is attached to a power source and not in the play mode. The attract mode is designed to entice passersby into playing the game. The game's characters are prominently displayed in the attract mode.

The attract modes of the plaintiff's and defendants' games are identical in their overall appearance. The attract modes of the defendants' games imitate not only the design features of the plaintiff's game characters but also the plaintiff's manner of presenting these characters. For example, in both the plaintiff's Pac-Man game and the defendants' Mighty Mouth game, the attract mode features the game characters and their nicknames in a vertical column. Although the names given the characters in defendants' games are different from plaintiff's, the general impression created by the presentation is the same. After the characters are introduced, a number of them engage in a chase underneath the column of characters and nicknames. This chase is identical in both games.

The operation of the attract mode enhances the likelihood of confusion from the defendants' use of characters identical to the plaintiff's. A person interested in playing a game must make his choice based on the attract mode. Since the defendants' attract mode features characters identical to the plaintiff's and presents these characters in a manner very similar to the plaintiff's, the ordinary consumer viewing the attract mode would likely think the game being advertised was the plaintiff's. In other words, the ordinary consumer would likely be confused about the source of the game.

■ An additional factor which should be considered is the degree of care likely to be used by potential customers. *SquirtCo v. Seven-Up Co., supra,* 628 F.2d at 1091; *RJR Foods, Inc. v. White Rock Corp., supra,* 603 F.2d at 1061. The cost of playing the parties' games is a quarter. This alone suggests that customer care would not be particularly keen. In addition, the atmosphere surrounding the games in their normal setting indicates that a customer would not be likely to scrutinize a game with such intensity that he would be able to distinguish the plaintiff's and defendants' games. This lack of consumer care is further evidence that there is a likelihood of confusion in the marketplace.

■ Two other factors which are related to the degree of consumer care deserve brief mention. These factors are degree of similarity between the parties' products and the competitive proximity of the products. *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc., supra,* 616 F.2d at 445; *Markel v. Scovill Manufacturing Co., supra,* 471 F.Supp. at 1250–51, 1252. When the parties' products are similar, defendants' use of the plaintiff's mark is likely to cause greater confusion than when dissimilar products are involved. The likelihood of confusion is further increased if the parties' products are distributed through similar channels of trade to the same ultimate customers. In the instant case, the parties'

---

**18.** "Similarity of the marks . . . must be considered as they are encountered in the marketplace. Although similarity is measured by the marks as entities, similarities weigh more heavily than differences." *AMF, Inc. [v. Sleekcraft Boats,* 9th Cir., 1979] 599 F.2d

[341] at 351. The comparison should be made "in light of what occurs in the marketplace," taking into account the circumstances surrounding the purchase of the goods. *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc., supra,* 616 F.2d at 444.

games are identical and are distributed through similar trade channels. These facts are further proof of likelihood of confusion.

■ Actual incidents of consumer confusion is another important factor which should be considered. Although actual confusion is not an essential element of a Lanham Act cause of action, it is positive proof of likelihood of confusion. *SquirtCo v. Seven-Up Co., supra,* 628 F.2d at 1091; *Markel v. Scovill Manufacturing Co., supra,* 471 F.Supp. at 1251. *See also Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1220–21. The Court has already discussed the consumer complaints received by Dirkschneider. These complaints indicate that some customers placed their money in the defendants' games expecting that the games would perform like the plaintiff's. These complaints are evidence of actual consumer confusion and provide further proof that the defendants' conduct is causing a likelihood of confusion in the marketplace.

■ The final factor relevant to the issue of likelihood of confusion is the defendants' conscious imitation of the plaintiff's game characters.[19] *RJR Foods, Inc. v. White Rock Corp., supra,* 603 F.2d at 1060. *See also Truck Equipment Service Co. v. Fruehauf Corp., supra,* 536 F.2d at 1220. In the instant action, the defendants had knowledge of the plaintiff's games and used characters in their games identical to the characters used by the plaintiff. This conduct suggests that the defendants were seeking to capitalize on the public recognition of the plaintiff's characters. The defendants' intent to capitalize gives rise to an inference that the defendants were successful in capitalizing on the plaintiff's reputation by confusing the public. *Markel v. Scovill Manufacturing Co., supra,* 471 F.Supp. at 1252; *D C Comics, Inc. v. Powers,* 465 F.Supp. 843, 848 (S.D.N.Y.1978). Thus, the defendants' conscious imitation is evidence of likelihood of confusion.

The evidence of likelihood of confusion is substantial. The Court therefore finds that the plaintiff will probably succeed in proving that the defendants' use of the plaintiff's game characters is likely to cause confusion in the mind of the average consumer.

**B. Irreparable Harm and Balancing of the Equities.**

■ The plaintiff need not present specific evidence of irreparable harm. Once the plaintiff proves the tendency of the defendants' conduct to deceive, the requirement of irreparable harm is satisfied. *Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc., supra,* 633 F.2d at 753; *Markel v. Scovill Manufacturing Co., supra,* 471 F.Supp. at 1254. The plaintiff has clearly established a tendency to deceive.

The Court's prior discussion of the competing equities in this case is also applicable to the plaintiff's cause of action under the Lanham Act. Without a preliminary injunction, the plaintiff will continue to be injured by the defendants' exploitation of the plaintiff's reputation and goodwill. *See Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc., supra,* 633 F.2d at 753. Since the defendants will not suffer substantial hardship, the Court finds that the balancing of the equities favors the issuance of an injunction.

**C. Public Interest**

■ One of the policies underlying § 43(a) of the Lanham Act is the protection of consumers from misleading descriptions of products.

Since § 43(a) was passed as a consumer protection statute, the courts are not reluctant to allow a commercial plaintiff to obtain an injunction even where the likelihood of pecuniary injury to the plaintiff may be slight. Thus, under § 43(a), Congressional policy appears to encourage commercial companies to act as the fa-

---

**19.** The issue of intent is thoroughly discussed in the Court's consideration of secondary meaning.

bled "vicarious avenger" of consumer rights. An injunction, as opposed to money damages, is no windfall to the commercial plaintiff. An injunction protects both consumers and the commercial plaintiff from continuing acts of false advertising. The fact that § 43(a) was passed to protect consumers as well as competitors is illustrated by the rule that a likelihood of consumer confusion is sufficient for injunctive relief. An injunction protects the consumer from continued false advertising.

*Id.* at 753 n. 7 *quoting* J. McCarthy, Trademarks & Unfair Competition § 27:5A at 250–51 (1973). The plaintiff has made a substantial showing that the public is likely to be confused. Thus, an injunction in the instant case would further the public interest by protecting consumers from the danger of confusion created by the defendants' products.

### D. Summary

The plaintiff has made a substantial showing that it will probably succeed in proving that its game characters are nonfunctional, and that the defendants' use of the characters creates a likelihood of confusion. Although the evidence of secondary meaning is not as substantial, this does not preclude the Court from issuing a preliminary injunction.

■ The record contains overwhelming evidence of the likelihood of confusion caused by the defendants' products. This confusion is evidence of the substantial injury which both the plaintiff and public will suffer if a preliminary injunction is not issued. In light of this injury, the Court is of the opinion that the plaintiff has made a sufficient showing that it will probably succeed in proving secondary meaning.[20] The Court therefore finds that the plaintiff is entitled to a preliminary injunction prohib-

iting the defendants from further violations of the Lanham Act.

An Order will be issued contemporaneously with this Memorandum Opinion.

---

20. [T]he court ordinarily is not required at an early stage to draw the fine line between a mathematical probability and a substantial possibility of success. This endeavor may, of course, be necessary in some circumstances when the balance of equities may come to require a more careful evaluation of the mer-

its. But where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if plaintiff has raised questions so serious and difficult as to call for more deliberate investigation.
*Dataphase Systems, Inc. v. C L Systems, Inc.,* *supra,* 640 F.2d at 113. *See also* note 1 *supra.*